UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DORENE MCSHEA, an individual,

               Plaintiff,

v.                                      Case No:  2:14-cv-127-FtM-38CM

THE SCHOOL BOARD OF COLLIER
COUNTY,    JOHN    ROBERT
GARDNER,  YOLANDA  FLORES,
KAMELA PATTON, ROXY MORA,
DAVID  STUMP  and  DEBORAH
TERRY,

               Defendants.

_____/

## **ORDER**[1]

     This matter comes before the Court on Defendants' Motion to Dismiss ([Doc. #17](#))

filed on April 2, 2014. Plaintiff filed a Response in Opposition ([Doc. #24](#)) on May 5, 2014.

Thus, the Motion is ripe for review.

### **Background**[2]

     Plaintiff ("McShea") is a former employee of Defendant School Board of Collier

County.  ([Doc. #2 at 4, ¶ 15](#)).  Defendant School Board of Collier County ("School Board")

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other Web sites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the Court has no agreements with any of these third parties or their Web sites. The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

[2] The Court makes no factual findings in this Order.  The facts herein are taken from Plaintiff's Second Amended Complaint ([Doc. #2 at 2-27](#)), as they must be considered to determine the instant Motion to Dismiss ([Doc. #17](#)).  *See Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (noting that when considering a motion to dismiss for failure to state a claim, courts must accept all factual allegations in the complaint as true and take them in the light most favorable to plaintiff).

is a governmental entity charged with operating various educational institutions, including Lorenzo Walker Technical High School ("LWTHS") located in Immokalee, Florida.  (Doc. #2 at 2, ¶ 6).  Defendant Kamela Patton ("Superintendent Patton") is an employee of the School Board, and served as superintendent of the School Board at all times relevant to this action.  (Doc. #2 at 3, ¶ 7).  Defendant David Stump ("Deputy Superintendent Stump") is an employee of the School Board, and served as deputy superintendent of the School Board at all times relevant to this action.  (Doc. #2 at 3, ¶ 8).

Defendant Deborah Terry ("Human Resources Director Terry") is an employee of the School Board, and served as executive director of human resources of the School Board at all times relevant to this action.  (Doc. #2 at 3, ¶ 9).  Defendant Roxy Mora ("Support Assistant Mora") is an employee of the School Board, and served as support assistant to Human Resources Director Terry at all times relevant to this action.  (Doc. #2 at 3, ¶ 10).  Defendant John Gardner ("Principal Gardner") is a former employee of the School Board, and served as principal of LWTHS at all times relevant to this action.  (Doc. #2 at 4, ¶ 11).  Defendant Yolanda Flores ("Vice Principal Flores") is an employee of the School Board, and served as vice principal of LWTHS at all times relevant to this action. (Doc. #2 at 4, ¶ 12).

In August 2009, the School Board hired McShea to serve as a reading coach at LWTHS.  (Doc. #2 at 4, ¶ 15).  McShea enjoyed continued success in this position until the beginning of the 2011-12 academic year.  (Doc. #2 at 6, ¶ 26).  At that time, the School Board decided to alter the administration of LWTHS by installing John Gardner as Principal and Yolanda Flores as Vice Principal. (Doc. #2 at 6, ¶ 27).  Over the course of the 2011-12 academic year, the new administration began to implement its own policies

at LWTHS.  But as these policies were implemented, McShea became concerned that the new LWTHS administration was ignoring local, state, and national requirements set out for her reading coach position.  (Doc. #2 at 6, ¶ 28).  Therefore, McShea raised her concerns over the academic year, seeking to find out what the administration's expectations of her were as the school's reading coach.  (Doc. #2 at 6, ¶ 28).  Instead of addressing McShea's continued concerns, Principal Gardner and Vice Principal Flores instituted yet another policy under their young administration: a systematic effort to retaliate against McShea for continually bringing up the administration's failure to adhere to the local and state requirements for the reading coach position.

The initial event that served as the catalyst for the administration's retaliatory behavior against McShea occurred in August 2011 when a school Guidance Counselor, Abby Lambley, instructed McShea to provide tutoring services to private citizens not enrolled at LWTHS.  (Doc. #2 at 7, ¶ 30).  Because her position as a reading coach was federally funded under Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 6301 *et seq.*, McShea took issue with this instruction, believing that providing tutoring services to private citizens would constitute a gross misuse of public services and funds.  (Doc. #2 at 7, ¶ 32).  When McShea questioned Lambley about the directions, Lambley instructed her that the tutoring directions originated with Vice Principal Flores and the administration.  (Doc. #2 at 7, ¶ 30).  Despite the origin of these instructions, McShea refused to comply and attempted to contact Vice Principal Flores over her concerns that providing such tutoring services would be an illegal misuse of federal funds. (Doc. #2 at 7, ¶¶ 32-33).

Vice Principal Flores, however, refused to address McShea's concerns, leading McShea to take her concerns to a different LWTHS administrator, Assistant Principal George Harvey.  (Doc. #2 at 7, ¶ 32). Notwithstanding the fact that Assistant Principal Harvey agreed with McShea's position, the administration decided to implement its new policy of retaliation against McShea throughout the remainder of the school year for her "insubordination."  (Doc. #2 at 7, ¶¶ 32-34).  It did not take long for the administration to find an opportunity to pursue this new policy.  Soon after the tutoring incident, in late August 2011, the School Board began contacting reading coaches from various schools for a leadership position opening that entailed coordinating a new system of instructional evaluation, titled the "Marzano Training."  (Doc. #2 at 7-8, ¶ 35).  But surprisingly, the School Board never contacted McShea about the opening, despite the fact that McShea was fully qualified for this new position.  (Doc. #2 at 8, ¶ 36).

More notably, in early September 2011, the LWTHS administration directed McShea to intermittently assume the responsibilities of a classroom instructor.  (Doc. #2 at 8, ¶ 37).  Because assuming these responsibilities would prevent her from performing her duties as a federally-funded reading coach, McShea took issue with this reassignment. (Doc. #2 at 8, ¶ 38).  Similar to the tutoring incident, McShea believed that the administration's actions constituted the misuse of federal funding because the intermittent reassignment denied the other LWTHS instructors of the services and data afforded to them through having a federally-funded reading coach at LWTHS.  (Doc. #2 at 8, ¶ 38).  After McShea raised these concerns, Vice Principal Flores simply responded that the other instructors "would have to be patient."  (Doc. #2 at 8, ¶ 40).

Later, in mid-September, the administration continued its scheme by denying McShea the opportunity to participate in and enjoy a "hold harmless" period. (Doc. #2 at 9, ¶ 42). During a "hold harmless" period, staff members at LWTHS were observed, evaluated, and received constructive feedback and instruction on their performance under newly-instituted performance standards. (Doc. #2 at 9, ¶ 42). Because McShea was the only staff member denied this opportunity, McShea approached Principal Gardner and asked how she would be evaluated as a reading coach. (Doc. #2 at 9, ¶ 43). But instead of informing McShea of her evaluation method, Principal Gardner dismissed McShea's inquiry, replied that he did not know, and walked away. (Doc. #2 at 9, ¶ 45).

At the end of September, the administration once again reassigned McShea to an intermittent classroom position. (Doc. #2 at 9, ¶ 46). As a result of this second reassignment, the LWTHS instructors and students were again denied McShea's services as a reading coach for nearly two months, despite the fact that McShea's position continued to be federally funded under Title 1 with specific mandates and requirements. (Doc. #2 at 9, ¶ 47). Unsurprisingly, McShea disagreed with this second reassignment and decided to draft an email to the administration expressing her disapproval. (Doc. #2 at 9-10, ¶ 48). In her email, McShea addressed the administration's lack of respect for the reading coach position and lack of communication. (Doc. #2 at 9-10, ¶ 48). In response, Principal Gardner and Vice Principal Flores summoned McShea to the administration's office for a meeting. (Doc. #2 at 9-10, ¶ 48).

During the meeting, Principal Gardner informed McShea that her second reassignment arose from the absence of another instructor, Kari Salrin, who was forced to take a leave of absence shortly before her sixty-second birthday. (Doc. #2 at 11, ¶ 57).

And because Salrin had not yet reached her sixty-second birthday, which would occur in November 2011, Principal Gardner told McShea that they "need[ed] to take care of Kari." (Doc. #2 at 11, ¶ 59).  McShea responded that she regretted Salrin's misfortune, but believed that the school's other instructors and students should not be affected by not having access to a reading coach for eight weeks.  (Doc. #2 at 11, ¶ 59).

McShea also expressed that she believed Principal Gardner's actions of reassigning her to "take care of Kari" constituted a misappropriation of federal funding. (Doc. #2 at 11, ¶ 59).  Despite McShea's objections, the administration continued with the second reassignment. McShea decided to comply, but noted that her compliance was "under duress and protest."  (Doc. #2 at 12, ¶ 65).  But during this second reassignment, McShea reached out to Joel Veiguela, a federal investigator, and secured official documents that would validate her misuse of federal funding claim.  (Doc. #2 at 10, ¶ 53). After receiving McShea's complaint, Veiguela forwarded the complaint to the Office of Inspector General with the Florida Department of Education.  (Doc. #2 at 10, ¶ 54).

During the same time period as these second reassignment events, McShea inquired to human resources about a September 23, 2011, job posting for a different "reading coach" position.  (Doc. #2 at 12, ¶ 67).  Instead of providing clear cut answers to McShea's inquiries regarding this posting, a human resources employee, Support Assistant Mora, provided McShea with "a number of obstructions, ambiguous responses, contradictory statements, and inconsistencies."  (Doc. #2 at 12, ¶ 69).  But Support Assistant Mora was not the only individual that sought to prevent McShea from applying for this position.  As part of the application for this new reading coach position, applicants were required to submit copies of their past evaluations.  (Doc. #2 at 12, ¶ 74).  When

McShea contacted Principal Garnder's secretary, Sharon Throne, requesting these documents, Throne ignored McShea's request and forced McShea to secure the documents from another source.  (Doc. #2 at 13, ¶ 75).  McShea was not selected for the position.

A few weeks later, in mid-October, Vice Principal Flores — who also served as the school's assessment coordinator — assigned McShea to proctor the fall session of the Florida Comprehensive Assessment Test ("FCAT").  (Doc. #2 at 13, ¶ 81). This assignment, however, was contrary to clearly established law, which mandated that FCAT proctors be trained for the new electronic administration of the exam.  (Doc. #2 at 13, ¶ 82).  Despite the fact that McShea possessed no such training, McShea proctored the fall session as directed.  As McShea was well aware, a school's FCAT results have a significant effect on its ranking, funding, and public perception.  (Doc. #2 at 13, ¶ 79). With this awareness in mind, McShea noticed that during the testing session, students were improperly seated as if to allow them to view the computer screens next to and in front of them.  (Doc. #2 at 13-14, ¶ 83).  McShea believed this "rais[ed] the specter" that the students were intentionally positioned in this manner to increase their FCAT scores. (Doc. #2 at 13-14, ¶ 83).  But the student's seating arrangement was not the only troubling aspect that McShea encountered while proctoring the exam.

In addition to the questionable seating arrangement, McShea encountered several issues with her student's computers.  (Doc. #2 at 14, ¶ 84).  However, when McShea sought Vice Principal Flores' assistance, Blanca Rodriguez, Vice Principal Flores' Assistant, informed McShea that Vice Principal Flores had left the building.  (Doc. #2 at 14, ¶ 85).  Faced with limited options, McShea contacted Guidance Counselor Lynne

Bruce and Technician Jorge Suarez, neither of who were able to provide assistance. (Doc. #2 at 14, ¶¶ 85-86).  Nevertheless, McShea continued to proctor the exam despite these issues.  And as the exam progressed, no one ever offered to relieve McShea from her duties, despite other proctors being offered such relief.  (Doc. #2 at 14, ¶ 89).  When the testing session concluded, McShea viewed the forms that proctors were required to sign upon the completion of their duties.  (Doc. #2 at 14, ¶ 90).  Instead of signing these forms, McShea refused and expressed that she could not do so in good faith because she did not have the proper training and because she observed possible security breaches.  (Doc. #2 at 14, ¶ 90).  McShea attempted to bring these issues to Vice Principal Flores' attention, but Vice Principal Flores dismissed McShea's claims once again and prevented McShea from being involved in future FCAT administrations.  (Doc. #2 at 14, ¶¶ 91-93).

By the end of October, the administration had, "[f]or the most part, . . . specifically and deliberately" confined McShea to her office, preventing her from properly performing as a reading coach and assuring that she would not be able to report any more issues with the school's FCAT testing procedures.  (Doc. #2 at 15, ¶ 94).  As November came, McShea decided to take action into her own hands by putting in public records requests for the school's required Title I reporting documents related to her reading coach position and for information about the fall FCAT session that she proctored.  (Doc. #2 at 15, ¶ 100).  The School Board provided McShea with the requested documents, but waited nearly three months to do so. (Doc. #2 at 15, ¶ 101).

Thereafter, in December, Principal Gardner and Vice Principal Flores composed the school's School Improvement Plan ("SIP") and published it by sending it out to the

school staff in an email and posting it on the Florida Department of Education website. (Doc. #2 at 15-16, ¶¶ 102-04).  When McShea reviewed the SIP, she noticed that her duties as a reading coach had been misrepresented.  (Doc. #2 at 15-16, ¶ 104). Specifically, Principal Gardner and Vice Principal Flores falsely stated that many tasks and programs had been implemented when in fact those tasks and programs were non-existent.  (Doc. #2 at 16, ¶ 106).  More disturbingly, Principal Gardner also misrepresented that he had earned a doctorate degree.  (Doc. #2 at 16, ¶ 107).  Armed with information about an "egregious and unlawful fraudulent misrepresentation," McShea contacted the Florida Department of Education Inspector General's Office and communicated her concerns with an agent named Dean Goodson.  (Doc. #2 at 16, ¶ 108).

Roughly three months later, on or about March 13, 2012, Goodson and Stuart Greenberg, Director for Reading Instruction with the State of Florida, contacted McShea by telephone regarding her concerns.  (Doc. #2 at 16, ¶ 111).  Following this phone call, McShea wrote an email to both Goodson and Greenberg explaining that a higher-up employee of the School Board, Charles Holimon, had knowledge of her illegal reassignment.  (Doc. #2 at 16, ¶ 112).  Soon after, on or about March 21, 2012, Goodson contacted McShea again by telephone and informed her that he had spoken to Holimon, who assured him that all the necessary federal grant requirements had been completed with regard to the reading coach position before any interruptions or reassignments. (Doc. #2 at 16, ¶ 113).  McShea believed that the School Board used Holimon to put the Florida Department of Education "off the scent" of their illegal behavior.  (Doc. #2 at 17, ¶ 114).  But notably, Holimon's acknowledgement of McShea's reassignment illustrated that

the School Board's senior administration not only knew of the illegal reassignment, but approved the "supplanting" of federal Title 1 funding.  (Doc. #2 at 17, ¶ 116).

After this exchange of correspondence, McShea noticed that someone altered the SIP posted on the Florida Department of Education's website by removing Principal Gardner's claim that he had earned a doctorate degree.  (Doc. #2 at 17, ¶ 117).  Despite this alteration, on or about April 4, 2012, Malinda Miguel, Chief Inspector General in the Office of the Governor of the State of Florida, contacted McShea regarding any information that she might possess about Principal Gardner fraudulently representing that he earned a doctorate degree.  (Doc. #2 at 17, ¶ 119).  McShea responded by providing Miguel with all the documentation that she had in her possession.  (Doc. #2 at 17, ¶ 120).

During this same time period, Assistant Principal Harvey also complained about unfair treatment to the School Board's senior administration, including Assistant Superintendent David Stump.  (Doc. #2 at 18, ¶ 121).  Rather than commending Assistant Principal Harvey for voicing his concerns, Assistant Superintendent Stump inquired as to where Assistant Principal Harvey obtained his information.  (Doc. #2 at 18, ¶ 122).  When Assistant Principal Harvey replied that he received his information from McShea, Assistant Superintendent Stump instructed Assistant Principal Harvey to "not talk with [McShea]" and to "stay away from [McShea]."  (Doc. #2 at 18, ¶ 122).  Thus, McShea's ability to function as the reading coach at LWTHS was seriously hampered by the School Board's senior administration instructing an assistant principal at LWTHS to not come into contact with her.  (Doc. #2 at 18, ¶ 122).

Based on these events, on or about April 10, 2012, McShea sent a "whistleblower letter" to Superintendent Patton, informing her of the foregoing events and noting who

had knowledge of them.  (Doc. #2 at 21, ¶ 150).  However, Superintendent Patton did not respond to McShea's letter.  (Doc. #2 at 21, ¶ 151).  Soon after, on or about April 14, 2012, McShea asked Victor Ortino, a private investigator, to send his investigate findings regarding Principal Gardner's falsification of his credentials to the School Board's attorney, John Fishbane.  (Doc. #2 at 18, ¶ 123).  When Fishbane contacted Ortino about his findings, Fishbane "defended" Superintendent Patton and refuted the claim that Superintendent Patton had any knowledge of Principal Gardner's falsification of his credentials.  (Doc. #2 at 22, ¶ 161).  But Fishbane noted that he was "aware" of McShea's "speech and complaints."  (Doc. #2 at 22-23, ¶ 162).

Two weeks later, McShea learned that human resources launched an investigation against her.  (Doc. #2 at 18, ¶ 124).  Without being told what the investigation related to or being given time to prepare, McShea met with Human Resources Director Terry.  (Doc. #2 at 18, ¶¶ 125-27).  At the meeting, Human Resources Director Terry directed McShea to remain "absolutely silent" about the investigation and to not discuss any details of the investigation, including any information related to Principal Gardner, with her coworkers. (Doc. #2 at 19, ¶ 130).  During the eight weeks following the meeting, human resources conducted "a significant number of interviews" with LWTHS staff regarding McShea. (Doc. #2 at 19, ¶ 132).  McShea noted that these interviews "were conducted with the intent to undermine and destroy [McShea's] reputation and ability to work with the staff." (Doc. #2 at 19, ¶ 132).  Although human resources concluded its investigation without any findings, McShea believed that human resources' true intent was to deny her of her freedom of speech and of her ability to gather evidence in her defense.  (Doc. #2 at 19, ¶ 132).

As the school year came to an end, the administration's retaliation against McShea continued into the summer months.  On the last day of school, Principal Gardner made an announcement that the school would be having a summer reading program for its students.  (Doc. #2 at 24, ¶ 172).  Despite the fact that McShea was the school's reading coach, the administration completely ignored McShea and never contacted her about getting involved in the summer program.  (Doc. #2 at 24, ¶ 174).  The administration also excluded McShea from "critical end-of-the-year training," but informed every other reading coach of the training to ensure their attendance.  (Doc. #2 at 24, ¶ 177).  McShea determined that this was a clear attempt to undermine her career.  (Doc. #2 at 24, ¶ 180).

After Principal Gardner resigned in July 2012, the School Board promoted Vice Principal Flores to Principal of LWTHS.  (Doc. #2 at 25, ¶ 188; 26, ¶ 194).  A short time after her promotion, Principal Flores contacted McShea and explained that McShea was going to be reassigned to a classroom instructor position for the upcoming school year. (Doc. #2 at 26, ¶ 194).    McShea viewed this reassignment as a "functional demotion" that resulted from her "protected speech and whistleblower activities."  (Doc. #2 at 26, ¶ 194).  "Unable to abide the continued retaliation," McShea resigned from her position "under protest and duress for which she required, and still requires, medical treatment and counseling."  (Doc. #2 at 26, ¶ 197).

Based on these facts, McShea filed a Second Amended Complaint against Defendants, asserting twelve counts: Violation of the First Amendment of the United States Constitution against the School Board (Count 1); Violation of the First Amendment of the United States Constitution against Defendant Gardner (Count 2); Violation of the First Amendment of the United States Constitution against Defendant Flores (Count 3);

Violation of the First Amendment of the United States Constitution against Defendant Patton (Count 4); Violation of the First Amendment of the United States Constitution against Defendant Mora (Count 5); Violation of the First Amendment of the United States Constitution against Defendant Stump (Count 6); Violation of the First Amendment of the United States Constitution against Defendant Terry (Count 7); Violation of the False Claims Act, 31 U.S.C. § 3730(h), against the School Board (Count 8); Violation of the Florida False Claims Act, Fla. Stat. § 68.088, against the School Board (Count 9); Violation of Florida's Public Whistleblower Act, Fla. Stat. § 112.3187(8)(c), against the School Board (Count 10); Defamation against Defendant Gardner (Count 11); and Defamation against Defendant Flores (Count 12).  (Doc. #2).  In response, Defendants filed a joint Motion to Dismiss, seeking dismissal of McShea's entire Second Amended Complaint.  (Doc. #17).

## Legal Standard

In deciding a Rule 12(b)(6) motion to dismiss, the Court limits its consideration to well-pleaded factual allegations, documents central to, or referenced in, the complaint, and matters judicially noticed. *La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir.2004)*. The Court must accept all factual allegations in Plaintiff's amended complaint as true and take them in the light most favorable to the plaintiff.  *Pielage v. McConnell, 516 F.3d 1282, 1284 (11th Cir.2008)*. Conclusory allegations, however, are not entitled to a presumption of truth. *Ashcroft v. Iqbal, 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)* (discussing a Rule 12(b)(6) dismissal); *Marsh v. Butler County, Ala., 268 F.3d 1014, 1036 n. 16 (11th Cir.2001)*.

The Court employs the *Twombly–Iqbal* plausibility standard when reviewing a complaint subject to a motion to dismiss. *Randall v. Scott,* 610 F.3d 701, 708, n. 2 (11th Cir.2010). A claim is plausible if the plaintiff alleges facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678*. The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Marsh,* 268 F.3d at 1036 n. 16. Thus, "the-defendant-unlawfully-harmed-me accusation" is insufficient. *Iqbal, 556 U.S. 662, 677, 129 S.Ct. 1937*. "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal modifications omitted). Further, courts are not "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

**Discussion**

A. <u>McShea Successfully Asserts a First Amendment Retaliation Claim Against Defendants</u>

Defendants begin their Motion by collectively arguing that Count 1 should be dismissed on the basis that McShea "was speaking purely on matters of private concern pertaining to her own job." (Doc. #17 at 2-3). In support, Defendants point the Court's attention to the extensive fact section included in McShea's Second Amended Complaint, which Defendants believe clearly indicates that all of McShea's speech was in reference to her own "job duties, personal grievances, and workplace conditions." (Doc. #17 at 4). For example, Defendants highlight McShea's complaints regarding having to tutor private

citizens not enrolled at LWTHS and being passed over for a new leadership position opening.  (Doc. #17 at 5).  Defendants assert that these and other incidents recited in the Second Amended Complaint elucidate that McShea "was not speaking as a private citizen on matters of public concern, but as [an employee] on matters arising out of her job situation and her anger, frustration, and disappointments that were related to it."  (Doc. #17 at 9).

In other words, "[t]he content of [McShea's] statements was directly tied to what was occurring during the course of her work as a [r]eading [c]oach and as an intermittently[-]assigned classroom teacher."  (Doc. #17 at 9).  Moreover, Defendants also contest McShea's allegation that "she was retaliated against for speech claims that led to her being demoted and constructively discharged."  (Doc. #17 at 10).  As Defendants explain, "there has to be an allegation of disciplinary action" to sustain a retaliation claim, but McShea fails to allege such an action, and instead relies on a "functional demotion," while also admitting to walking off the job.  (Doc. #17 at 10).   Finally, Defendants dispute McShea's allegation that the School Board "engaged in a policy or custom of terminating employees who exercised their free speech rights."  (Doc. #17 at 10).  Similar to the retaliation allegation, Defendants aver that McShea fails to identify any such policy or custom that would support her allegation.  (Doc. #17 at 10).

In response, McShea first points the Court's attention herself to eight allegations in the Second Amended Complaint that she believes clearly relate to a matter of public concern – "the welfare of children and the proper direction of federal and state funds to our publically funded school system."  (Doc. #24 at 10).  And because, at this stage in the litigation, these allegations must be taken as true, McShea asserts that her "speech [is]

very clearly as a citizen as it was being made on matters directly affecting the children who [Defendants] have a fiduciary duty to care for and educate in accordance with federal and state law."   (Doc. #24 at 11). Consequently, McShea avers that her "speech addressed an issue relating to the mission of the government employer and was a matter of public concern."   (Doc. #24 at 11).

In addition, McShea cites Eleventh Circuit precedent to refute Defendants' argument that the fact that McShea's complaints were made within the confines of her employment is dispositive.  (Doc. #24 at 11-12).  As McShea explains, the Eleventh Circuit has found neither the fact that a plaintiff makes her complaint through workplace resources or the fact that a plaintiff makes her complaint regarding the subject matter of her employment to be dispositive on whether the plaintiff's speech was made as a private citizen or public employee.  (Doc. #24 at 11-12 (citing *D'Angelo v. Sch. Bd. Of Polk County, Fla.*, 497 F.3d 1203, 1211 (11th Cir. 2007)).  Finally, McShea concludes that she "alleges quite clearly that she complained vociferously about matters of public concern and that she was then subjected to a campaign of retaliation, with all Defendants participating in this campaign." (Doc. #24 at 12).

Time and time again, the Supreme Court has reiterated that "[s]peech by citizens on public concerns lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"  *Lane v. Franks*, ------ U.S. ------, 134 S.Ct. 2369, 2377, 189 L.Ed.2d 312 (2014) (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)).   And "[t]his remains true when speech concerns information related to or learned through public employment."  *Id.*  For it is well established that the

acceptance of public employment does not require the employee to relinquish their constitutional rights, especially those afforded under the First Amendment.  *Id.*

But a public employee's right to disseminate information is not absolute.  Instead, the Supreme Court has "acknowledged the government's countervailing interest in controlling the operation of its workplaces" because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."  *Id.*  Consequently, "[t]he problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968).

The Supreme Court first announced "some of the general lines along which an analysis of the[se] controlling interests should run" in *Pickering*, 391 U.S. at 569, 88 S.Ct. 1731.  From these general lines, two inquires emerged to guide interpretation of the First Amendment protection provided to a public employee's speech.  The first inquiry asks whether the employee spoke on a matter of public concern.  *Garcetti*, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).  If not, then the employee is not entitled to First Amendment protection for his or her employer's reaction to the speech.  *Id.*  (citing *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).  But if the answer to this first inquiry is yes, then the Court is alerted to the possibility of a First Amendment claim.  The Court must then proceed to the second inquiry of the *Pickering* framework, and the relevant question

becomes whether the defendant government entity had an adequate justification for treating the plaintiff employee differently from any other member of the general public. *Id.* (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).

Nearly forty years after the *Pickering* framework first emerged, the Supreme Court modified the first inquiry in *Garcetti*, 547 U.S. 410, 126 S.Ct. 1951.  In doing so, the Supreme Court emphasized that courts must consider not only whether the plaintiff was speaking on a matter of public concern, but also whether the plaintiff was speaking as a private citizen or as a public employee.  *Id.* at 418, 126 S.Ct. 1951.  As the *Garcetti* Court explained, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951.  After this modification, the first inquiry of the *Pickering* framework now asks "whether the employee spoke as a *citizen* on a matter of public concern." *Id.* at 418, 126 S.Ct. 1951 (emphasis added); *see also D'Angelo v. Sch. Bd. of Polk Cnty., Fla.*, 497 F.3d 1203, 1209 (11th Cir. 2007) (collecting cases that note *Garcetti* significantly modified the first inquiry of the *Pickering* framework).

Most recently, the Supreme Court clarified its holding in *Garcetti*, finding that the Eleventh Circuit read *Garcetti* too broadly.  *Lane*, ---- U.S. at ----, 134 S.Ct. at 2379.  In *Lane*, the Supreme Court turned down the Eleventh Circuit's reasoning "that, because [a plaintiff] learned of the subject matter of his testimony in the course of his employment with [the defendant government entity], *Garcetti* requires that his testimony be treated as the speech of an employee rather than that of a citizen." *Id.* (citation omitted).  In doing so, the Supreme Court noted that "*Garcetti* said nothing about speech that simply relates

to public employment or concerns information learned in the course of public employment." *Id.* The Court then went on to clarify that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id.* Rather, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

With this framework in mind, the Court must first determine whether McShea spoke as a private citizen or as a public employee within the scope of her duties. *Id.* Throughout her Second Amended Complaint, McShea details her attempt to bring two concerns to the LWTHS administration's attention – the misuse of federal funding and the improper administration of the FCAT examination.  When the LWTHS administration ignored McShea's concerns, McShea contacted two independent third parties: the United States Department of Education and the Florida Department of Education.  And for the purposes of this Motion, it is this contact with third parties that is key.

If McShea voiced her concerns to only Defendants, the Court might agree with Defendants' conclusion that McShea's speech qualifies as employee speech unprotected by the First Amendment.  *See, e.g., Mpoy v. Rhee*, 758 F.3d 285, 291-94 (D.C. Cir. 2014) (holding that the plaintiff's speech – an email to the school district's administration, complaining that the school's principal falsified records and interrupted the plaintiff's ability to perform his teaching duties – "constituted employee speech unprotected by the First Amendment").  But this is not the case.  And Defendants fail to provide any argument in their Motion asserting that McShea's contact with either the United States Department of Education or the Florida Department of Education was within her ordinary job duties.

Therefore, McShea's communication with these third-party entities clearly qualifies as citizen—rather than employee—speech.

Next, the Court must consider whether McShea's communication as a citizen was on a matter of public concern.  Unsurprisingly, the Supreme Court has routinely held that the misuse or mismanagement of school funding is a matter of public concern.  In fact, the *Pickering* Court explicitly stated that "[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent." 391 U.S. at 572, 88 S.Ct. 1731.  And "it is essential that they be able to speak freely on such questions without fear of retaliatory dismissal." *Id.*  Moreover, *Garcetti* illustrates that this sentiment has not subsided in recent years. There, the Supreme Court noted that "[e]xposing governmental inefficiency and misconduct is a matter of *considerable significance.*" *Garcetti*, 547 U.S. at 425, 126 S.Ct. 1951; *see also Lane*, ---- U.S. at ----, 134 S.Ct. at 2380 ("The content of Lane's testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern.").  Based on this extensive Supreme Court precedent, it is clear that the content of McShea's speech — the misuse of federal funding — was a matter of public concern.

Having determined that McShea conducted her speech as a private citizen on a matter of public concern, the Court must proceed to the second inquiry of the *Pickering* framework:  whether the defendant government entity had an adequate justification for treating the plaintiff employee differently from any other member of the general public. *Garcetti*, 547 U.S. at 418, 126 S.Ct. 1951.  Here, Defendants fail to raise any governmental interests that illustrate McShea's speech should not be afforded First

Amendment protection.  Instead, Defendants simply aver that "[t]here is no factual allegation of a demotion, any disciplinary actions or write-ups against her, no loss of pay or job benefits, nor any termination recommendation or decision."  (Doc. #17 at 10).  From Defendants' perspective, their actions were justified because McShea walked off her job. (Doc. #17 at 10).

A simple review of the Second Amended Complaint, however, reveals that McShea not only alleged that she "had been reassigned to the classroom, a functional demotion" (Doc. #2 at 26, ¶ 194), but also alleged that she suffered from such an extensive amount of retaliation that she had no choice but to resign and seek medical treatment and counseling (Doc. #2 at 26, ¶ 197).  Defendants fail to argue that they treat every other member of the general public in the same manner.  And without such an argument, Defendants must provide an alternative argument — asserting that they had an adequate justification for treating McShea in this manner — in order to defeat McShea's First Amendment claim.  But Defendants fail to raise this argument either.  Consequently, at this stage in the litigation, the Court concludes that McShea's speech is entitled to protection under the First Amendment.

B. <u>Each of the Individual Defendants are Entitled to Qualified Immunity</u>

Defendants continue their Motion by collectively arguing that even if McShea's speech is protected by the First Amendment, each of the individual Defendants are entitled to qualified immunity.  (Doc. #17 at 11).  In support, Defendants provide separate arguments for each individual Defendant, asserting that each was acting within the course and scope of their discretionary authority.  (Doc. #17 at 12-13).  In response, McShea recites an extensive amount of case law on qualified immunity and argues, in a single sentence,

that because the burden of proving qualified immunity rests with Defendants, this affirmative defense is not available from the face of the Second Amended Complaint. (Doc. #24 at 13-14).  The Court will address whether Defendants are entitled to qualified immunity on an individual basis.[3]

It is well known that "[q]ualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'"  *Lane,   ----   U.S. at ----, 134 S.Ct. at 2381* (quoting *Ashcroft v. al-Kidd, 563 U.S. ----, ----, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011)*).  Consequently, "courts may not award damages against a government official in his personal capacity unless 'the official violated a statutory or constitutional right,' and 'the right was 'clearly established' at the time of the challenged conduct.'"  *Id.*  But in order to be "clearly established," the right must be one that has been "'developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law."  *Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012)* *cert. denied*, *133 S.Ct. 646, 184 L.Ed.2d 465 (2012)* (quoting *Lassiter v. Alabama A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir.1994)*).

Moreover, whether the government official was motivated by dislike or hostility towards the protected behavior, such as First Amendment speech, is not, in and of itself, dispositive.  *Id.*  Instead, where the government official acts in the same manner that they

---

[3] The Court notes that Plaintiff fails to indicate whether she is suing the individual Defendants in their personal or official capacities.  But because Plaintiff's Counts against the individual Defendants in their official capacities would be barred by the Eleventh Amendment, the Court will address Plaintiff's Counts as if they were pled against the individual Defendants in their personal capacities and conduct a qualified immunity analysis.  *See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989)* (holding that "a suit against a state official in his or her official capacity is not a suit against the official but rather against the official's office," and is therefore barred by the Eleventh Amendment).

would have absent the discriminatory intent, their actions are lawful. *Id.*   In other words, "'[u]nless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct—despite his having adequate lawful reasons to support the act—was the result of his unlawful motive, the defendant is entitled to immunity.'"  *Id.* (quoting *Foy v. Holston*, 94 F.3d 1528, 1535 (11th Cir. 1996)).   Applying these principles, the Court must determine whether each Defendant, on an individual basis, knew whether their respective retaliatory actions, based upon all the information available to them at the time, including any knowledge of McShea's protected speech, were objectively reasonable.[4] *Id.* at 1364 (citing *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1294 (11th Cir. 2000)).

### 1. Principal Gardner

McShea alleges that Principal Gardner violated her First Amendment rights by 1) failing to provide her with required trainings and evaluations; 2) failing to inform her of the performance standards and expectations for her position; 3) intermittently assigning her to a classroom teaching position on two occasions; 4) conducting an internal investigation of her that paralleled the human resources investigation; 5) electronically stalking her by following her on the LWTHS surveillance system; and 6) failing to offer her a position in the LWTHS summer reading program.[5]   Despite McShea's insistence that these acts constitute First Amendment violations, McShea fails to present any precedent, and the Court is aware of none, suggesting that a reasonable principal armed with the knowledge

---

[4] Plaintiff fails to raise the argument that Defendants were not acting in their discretionary capacity. Therefore, the Court's analysis will focus on Plaintiff's burden of illustrating that Defendants are not entitled to qualified immunity. *See Sherrod*, 667 F.3d at 1363 (noting that when parties do not dispute that the defendants were acting in a discretionary capacity, the burden shifts to the plaintiff to illustrate qualified immunity is inapplicable).

[5] It should be noted that Plaintiff does not allege that Principal Gardner had any participation in her "functional demotion."

Principal Gardner possessed, including knowledge of McShea's whistleblower activities, would know that these activities constitute First Amendment violations. Accordingly, Principal Gardner is entitled to qualified immunity, and McShea's Count 1 must be dismissed.

2. *Vice Principal Flores*

Because the Court has already determined that six of McShea's eight allegations attributable to Vice Principal Flores' conduct do not constitute First Amendment violations in the Principal Gardner analysis above, the Court will focus on the two additional allegations. Those two allegations assert that Vice Principal Flores violated McShea's First Amendment rights by assigning her to proctor the fall administration of the FCAT, despite her not having the proper training, and "functionally demoting" her by reassigning her to a classroom teaching position for the 2012-13 academic year. As to the FCAT allegation, McShea fails to present any precedent, and the Court is aware of none, suggesting that a reasonable vice principal armed with the knowledge that Vice Principal Flores possessed would know that they must not assign a reading coach to cover a single session of an FCAT examination session. Not to mention, the Court is perplexed how such an act could constitute a First Amendment violation in the first place.

With that being said, McShea's "functional demotion" allegation, on its face, appears to have a higher probability of constituting a First Amendment violation. A review of the record, however, reveals that no such violation occurred. In the Second Amended Complaint, McShea admits that she was reassigned to an intermittent classroom teaching position before she conducted her whistleblowing activities. Given such an admission, it follows that Vice Principal Flores must have had reasoning beyond punishing McShea for

her whistleblowing activities for assigning McShea to this earlier classroom teaching position.

Therefore, in order to proceed with her claim against Vice Principal Flores, McShea must present the Court with precedent indicating that a reasonable vice principal, armed with the knowledge that Vice Principal Flores possessed, including knowledge of McShea's whistleblowing activities, would know that they could not once again reassign McShea to a classroom position again after McShea engaged in whistleblowing activities. *See Sherrod v. Johnson, 667 F.3d at 1364* (holding that when the record shows that a school administrator had lawful justifications for taking an action, the plaintiff must present precedent that illustrates a reasonable administrator in the defendant's position would know that such an action was not objectively reasonable).  But McShea fails to present any precedent, and the Court is aware of none, indicating as much.  Therefore, Vice Principal Flores is entitled to qualified immunity, and McShea's Count 3 must be dismissed.

### 3. Superintendent Patton

McShea alleges that Superintendent Patton violated her First Amendment rights and allowed the "investigation and interrogations, the harassment, and the hostile work environment all to continue" by 1) failing to respond to a whistleblower letter and 2) contacting a teacher named Jackie Hagerman regarding Principal Gardner.  (Doc. #2 at 21-22, ¶¶ 150-53).  But McShea fails to present any precedent, and the Court is aware of none, suggesting that a reasonable superintendent armed with the knowledge Superintendent Patton possessed, including the allegations contained in the whistleblower letter, would know that they must respond to a whistleblower letter and/or

could not contact a teacher about another employee.   Consequently, Superintendent Patton is entitled to qualified immunity, and McShea's Count 4 must be dismissed.

### 4.  Deputy Superintendent Stump

McShea alleges that Deputy Superintendent Stump violated her First Amendment rights by instructing Assistant Principal Harvey to "not talk with her" and to "stay away from her."  (Doc. #2 at 18, ¶ 122).   Once again, McShea fails to present any precedent, and the Court is aware of none, suggesting that a reasonable deputy superintendent armed with the knowledge Deputy Superintendent Stump possessed – primarily complaints from Assistant Principal Harvey regarding the LWTHS – would know that they must not instruct an assistant principal to not talk to a teacher and/or to stay away from a teacher.   Therefore, Deputy Superintendent Stump is entitled to qualified immunity, and McShea's Count 6 must be dismissed.

### 5.  Human Resources Director Terry

McShea alleges that Human Resources Director Terry violated her First Amendment rights by starting an investigation of her that ended in "no finding" and failing to "investigat[e], scrutinize, and judge" whistleblower information.  (Doc. #2 at 18-19, ¶¶ 127-132; 21, ¶¶ 146-149; 23, ¶¶ 163-166).   Yet again, McShea fails to present any precedent, and the Court is aware of none, suggesting that a reasonable human resources director armed with the knowledge Human Resources Director Terry possessed, including that gained through her investigation and through the whistleblower claims, would know that they must "investigat[e], scrutinize, and judge" whistleblower information and must not investigate a teacher.   Accordingly, Human Resources Director Terry is entitled to qualified immunity, and McShea's Count 7 must be dismissed.

*6.  Support Assistant Mora*

Finally, McShea alleges that Support Assistant Mora violated her First Amendment rights by "present[ing] a number of obstructions, ambiguous responses, contradictory statements, and inconsistencies that might have (and were clearly intended to) ultimately prevented[]" her from meeting a deadline for a job posting. (<u>Doc. #2 at 12, ¶ 69</u>).  Beyond this single conclusory sentence, McShea fails to detail how Support Assistant Mora presented these obstacles or how they "might" have prevented her from being selected for the job opening.  And, in similar fashion to each of the other individual Defendants above, McShea fails to present any precedent, and the Court is aware of none, suggesting that a reasonable support assistant armed with the knowledge Support Assistant Mora possessed — i.e., that McShea wanted to apply for a job opening — would know that they must reply to McShea's inquiries in a manner that satisfies McShea's subjective taste.  Thus, Support Assistant Mora is entitled to qualified immunity, and McShea's Count 5 must be dismissed.

C.  <u>McShea Successfully States a Claim for Retaliatory Discrimination Under the False Claims Act</u>

McShea brings Count 8 solely against the School Board, alleging a violation of the False Claims Act, <u>31 U.S.C. § 3730(h)</u>.  (<u>Doc. #2 at 43-47</u>). The School Board now seeks dismissal of Count 8 on the basis that McShea fails to properly plead a violation of the False Claims Act upon which relief can be granted.  (<u>Doc. #17 at 13</u>).  Specifically, the School Board disputes that McShea has alleged sufficient details in the Second Amended Complaint to meet three of the four elements needed to properly state a *prima facie* False Claims Act violation.  In support, the School Board argues that 1) McShea never alleges

that the School Board made any claim, false or otherwise, to the federal government to obtain federal funds (Doc. #17 at 15-17); 2) McShea fails to allege any facts that amount to retaliation or constructive discharge (Doc. #17 at 17-20); and 3) McShea fails to illustrate that anyone was put on notice of a False Claims Act claim, thereby preventing her from being able to demonstrate causation. (Doc. #17 at 20-21). In response, McShea directs the Court's attention to various portions of her Second Amended Complaint, which she believes plead enough factual detail to defeat each of the School Board's deficiency arguments. (Doc. #24 at 14-19).

The False Claims Act is the primary statute upon which the United States Government relies on to recover losses caused by fraud perpetrated in the form of "false claims." *McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) (citation omitted). To encourage employees to report violations of the Act, a Whistleblower Provision grants employees the right to bring a retaliation claim against their employer if they are discriminated against in their employment because of their attempts to stop 1 or more of the "false claims" enumerated under the Act. 31 U.S.C. § 3730(h) (2010). Employees enjoy this right even if they are not aware of the existence of the False Claims Act at the time they attempt to stop the false claim. *See Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996), *cert. denied*, 519 U.S. 1148, 117 S.Ct. 1080, 137 L.Ed.2d 216 (1997) ("[N]othing in the language of § 3730 suggests that its protections are limited to those who were motivated by it.").

In order to qualify for protection under the Whistleblower Provision, McShea must illustrate 1) that she was engaged in protected conduct and 2) that the School Board retaliated against her because of that protected conduct. *Mack v. Augusta-Richmond*

*Cnty, Ga.*, 148 F.App'x 894, 897 (11th Cir. 2005) (citation omitted). With regard to the first factor, absent an actual *qui tam* action, the Court must evaluate whether McShea engaged in protected conducted under the "distinct possibility" standard. *See U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303-04 (11th Cir. 2010) (evaluating the plaintiff's claim of engaging in protected conduct under the "distinct possibility" standard when she did not file a *qui tam* action). Under this standard, McShea's conduct constitutes "protected conduct" only if "there was at least 'a distinct possibility' of litigation under the False Claims Act at the time of the employee's actions." *Id.* at 1303 (citing *Childree*, 92 F.3d at 1140). In applying this standard, the Eleventh Circuit concluded that a plaintiff's "allegations that she complained about the defendants' 'unlawful actions' and warned them that they were 'incurring significant criminal and civil liability' . . . [was] sufficient, if proven, to support a reasonable conclusion that the defendants were aware of the possibility of litigation under the False Claims Act." *Id.* at 1304.

The Court finds no significant difference between the allegations in the instant action and *Sanchez*. In the Second Amended Complaint, McShea alleges that she complained to the LWTHS administration on multiple occasions about the illegal misuse of federal funding. (Doc. #2 at 7, ¶¶ 32-33; 8, ¶ 38; 10, ¶ 52; 11, ¶ 59). While McShea did not warn the LWTHS administration that they could incur "significant criminal and civil liability," McShea made clear that the LWTHS administration's actions were contrary to state and federal law. In addition, beyond alerting the LWTHS administration, McShea alleges that she composed a whistleblower letter to Superintendent Patton detailing, among other topics, this gross misuse of federal funding. (Doc. #2 at 21, ¶ 150). Consequently, at this

stage in the litigation, it appears that the School Board was aware of the possibility of litigation under the False Claims Act.

Having determined that McShea's allegations support a reasonable conclusion that the School Board was aware of the possibility of litigation under the False Claims Act, at this stage in the litigation, the Court's analysis does not need to proceed further.  Indeed, both Parties brief the Court on *Mack*'s second factor – whether the School Board retaliated against McShea because of her protected conduct – by citing to the Middle District of Alabama case *Mann v. Olsten Certified Healthcare Corp.*, 49 F.Supp.2d 1307 (M.D. Ala. 1999).  But *Mann* dealt with a claim for retaliatory discharge under § 3730(h) at the summary judgment stage.  In contrast, the instant action is only at the motion to dismiss stage.  And the Eleventh Circuit has explicitly held: "If an employee's actions, as alleged in the complaint, are sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a *qui tam* action by the employee, then the complaint states a claim for retaliatory discharge under § 3730(h)." *Sanchez*, 596 F.3d at 1304.  Because McShea's allegations, taken as true, are sufficient to support a reasonable conclusion that the School Board could have feared being reported for the illegal misuse of federal funding, McShea's Second Amended Complaint sufficiently states a claim for retaliatory discharge under § 3730(h).  *See, e.g., U.S. ex rel. Gatsiopoulos v. Kaplan Career Inst.*, Case No. 09-21720-CIV, 2010 WL 5392668, at *7 (S.D. Fla. Dec. 22, 2010) (finding that the plaintiff stated a claim for retaliatory discharge under § 3730(h) under similar facts).

D.  McShea's Florida False Claim Act Count Must Be Dismissed

McShea brings Count 9 solely against the School Board, alleging a violation of the Florida's False Claims Act, Fla. Stat. § 68.088 (2012).  (Doc. #2 at 48-49).  The School Board now seeks dismissal of Count 9 on the same basis asserted for dismissal of Count 8, but also adds that McShea fails to allege "that any false demand was made on any official of the state of Florida for any funds provided by the state of Florida."  (Doc. #17 at 21).  McShea titles a section of her Response as "The Plaintiff Has Properly Pled a Cause of Action under the [False Claims Act] and [Florida False Claims Act]," but fails to provide a single substantive argument regarding her Florida False Claims Act Count.  (Doc. #24 at 14).  Instead, McShea devotes the entire section to the defense of her federal False Claims Act Count, which has already been addressed.  (Doc. #24 at 14-19).

Similar to the federal False Claims Act, Florida's False Claim Act was enacted as the primary statute upon which the Florida state government relies on to recover losses caused by fraud perpetrated in the form of "false claims."  Fla. Stat. § 68.088 (2012). Indeed, Florida's False Claims Act also provides protection to "[a]ny employee who is . . . demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions" of their employment because of their attempts to stop a "false claim," as enumerated under the Act.  *Id.* But in contrast to the Whistleblower Provision of the federal False Claims Act, the Anti-Retaliation Provision of Florida's False Claims Act does not, in and of itself, provide a basis for a cause of action.  Instead, the Anti-Retaliation Provision alerts employees that if they were discriminated against in violation of the Provision, they have a cause of action under Florida's Whistleblower Act, Fla. Stat. § 112.3187.

Here, McShea asserts claims under both the Florida False Claims Act's Anti-Retaliation Provision and the Florida's Whistleblower Act.  Accordingly, the Court finds that McShea's Count 9, asserting a cause of action under the Anti-Retaliation Provision, must be dismissed as duplicative.

E.  McShea's Florida's Whistleblower Act Count Must Be Dismissed

McShea asserts Count 10 solely against the School Board, alleging a violation of Florida's Whistleblower Act, § 112.3187.  (Doc. #2 at 21-23).  The School Board now seeks dismissal of Count 10 on the basis that McShea failed to comply with the "presuit requirements" set out in § 112.3187.  (Doc. #17 at 21-23).  In support, the School Board first asserts that under § 112.3187(6), McShea was required to allege that she "was asked to participate in an adverse action" or that she "initiated a complaint through a whistle-blower's hotline," but failed to do so.  (Doc. #17 at 21-22).  Next, the School Board argues that McShea failed to exhaust her administrative remedies.  (Doc. #17 at 22).  Finally, the School Board disputes that it ever disciplined or took any adverse employment action towards McShea, as required by § 112.3187(4).  In response, McShea simply avers that she "filed her claims within the statutorily required 180-days and alleg[ed] [in the Second Amended Complaint that] she exhausted her administrative remedies."  (Doc. #24 at 20).

Florida's Whistleblower Act was enacted, among other reasons, to prevent public employers from taking retaliatory action against employees who report — to an appropriate agency — the mismanagement, misfeasance, or malfeasance of public funds on the part of their employer.  § 112.3187(1).  When evaluating claims under this Act, the Court must do so in the same manner as claims brought under Title VII of the Civil Rights Act of 1964.  *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000).

Therefore, to establish a *prima facie* claim under Florida's Whistleblower Act, McShea must illustrate that 1) she engaged in a statutory protected activity; 2) she suffered an adverse employment action; and 3) there was a causal connection between the two events. *Castro v. Sch. Bd. of Manatee Cnty., Fla.*, 903 F.Supp.2d 1290, 1302 (M.D. Fla. 2012) (citing *Fla. Dept. of Children and Families v. Shapiro*, 68 So.3d 298 (Fla. 4th DCA 2011)).

The Court must first determine whether McShea engaged in a statutory protected activity.  To engage in such an activity, McShea must have disclosed information about an act of mismanagement, malfeasance, or misfeasance of public funds to a chief executive officer, which, in the school district context, is the school district's superintendent.  § 112.3187(5)-(7).  Here, there is no question that McShea engaged in a statutory protected activity when she sent a letter directly to Superintendent Patton detailing the LWTHS' administration's misuse of public funding.  (Doc. #2 at 21, ¶ 150).  But before deciding whether McShea suffered adverse employment action, the Court notes that McShea blatantly lacks a causal connection between her whistleblower letter to Superintendent Patton and any possible adverse employment action.

In the Second Amended Complaint, McShea alleges that Superintendent Patton failed to respond to her letter and did nothing "to rectify the situation."  (Doc. #2 at 21, ¶ 151).  Notably, however, McShea fails to allege that Superintendent Patton took any action that affected her employment.  Instead, McShea continually references that members of the LWTHS administration, including Principal Gardner and Vice Principal Flores, harassed and functionally demoted her.  And without a single allegation that Superintendent Patton was involved in the harassment or functional demotion, McShea lacks any type of a

causal connection between her statutory protected activity and her adverse employment action.  Admittedly, it is much more plausible that McShea's adverse employment action, if any, arose from her continual conflicts with the LWTHS administration rather than her single letter to Superintendent Patton.  As such, Count 10 must be dismissed.

   F.  McShea's Defamation Counts Must Be Dismissed

McShea concedes that Counts 11 and 12, alleging claims of defamation against Principal Gardner and Vice Principal Flores, respectively, should be dismissed.  (Doc. #24 at 20).   Consequently, Counts 11 and 12 are dismissed.

Accordingly, it is now

**ORDERED:**

Defendants' Motion to Dismiss (Doc. #17) is **GRANTED in part** and **DENIED in part**.

   1.  Plaintiff's Counts 2, 3, 4, 5, 6, 7, 9, 10, 11, and 12 are **DISMISSED WITHOUT PREJUDICE**.

   2.  As to Counts 1 and 8, Defendant's Motion is **DENIED.**

**DONE** and **ORDERED** in Fort Myers, Florida, this 3rd day of November, 2014.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record